HELANE L. MORRISON (#127752)
JAMES A. HOWELL (#92721)
CHRISTOPHER COOKE (#142342)
PATRICK THOMAS MURPHY (Admitted in N.Y. State)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 1100
San Francisco, California 94104
Telephone: (415) 705-2500

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

SECURITIES AND EXCHANGE COMMISSION,

    *Plaintiff,*

    v.

MANOUCHER SARBAZ; PACIFIC GOLF
COMMUNITY DEVELOPMENT, LLC and LEE
ANDREW HILL,

    *Defendants.*

Case No. _ SACV03-881 CJC JSL (CTx)
    03-1310

**COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS**

Plaintiff Securities and Exchange Commission ("Commission") alleges:

**I.     JURISDICTION**

1.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77v(a)] and Sections 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(e) and 78aa]. Defendants, directly or indirectly, have made use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the acts, practices and courses of business alleged in this Complaint.

**II.     SUMMARY OF ALLEGATIONS**

2.     Between August 1996 and December 29, 2000, a Los Angeles real estate developer, Pacific Golf Community Development, LLC ("Pacific Golf"), its managing member,

COMPLAINT
S.E.C. v. Sarbaz

FEB 27 2003

02/25/2003 10:06:23 AM  Receipt #: 33484

Cashier : NPONCE [LA 1-1]
Paid by: FIRST LEGAL SUPPORT
03-1310
2003-086900      5 - Filing Fee Civil(1)
Amount :                        $60.00
03-1310
2003-510000     11 - Special Fund F/F(1)
Amount :                        $90.00
Check Payment : 5225 /          150.00
Total Payment :                 150.00

1  Manoucher Sarbaz ("Sarbaz"), and a real estate appraiser, Lee Andrew Hill ("Hill") defrauded

2  and misled investors who purchased municipal bonds issued in connection with a real estate

3  development known as the "Rancho Lucerne Master Planned Community" ("Rancho Lucerne" or

4  the "Project") in San Bernardino County.

5         3.       During that period, two local government entities and two non-profit

6  associations issued more than $83 million in purported tax-exempt municipal securities for the

7  stated purposes of acquiring public lands and financing the construction of public improvements

8  in Rancho Lucerne.  The Rancho Lucerne securities were special purpose, limited obligation and

9  "conduit financings," which meant that most of the money obtained through the offerings was

10  funneled to Pacific Golf for development of the property.  The entities that issued the securities

11  were not responsible for repayment.  Instead, bond purchasers would be repaid, if at all, by

12  revenue that Pacific Golf generated from the successful development of Rancho Lucerne or from

13  sales of property pledged by other entities controlled by Sarbaz.

14        4.       Defendants Pacific Golf and Sarbaz provided false and misleading

15  information that was used to persuade investors that the Project would be successful.  Among

16  other things, Sarbaz and Pacific Golf provided false and misleading information concerning their

17  background and experience in large-scale residential developments, provided exaggerated

18  projections of sales of residential home sites and revenue from those sales, falsely described

19  supposed contracts with construction companies and home builders which in fact did not exist,

20  and hid the existence of lawsuits filed against them.  Defendant Hill provided false and

21  misleading appraisals and estimates of land values that were used to persuade investors that the

22  securities were also backed by valuable real estate.  Hill's appraisals were based on assumptions

23  and data that he, Sarbaz and Pacific Golf knew, or were reckless in not knowing, were incorrect

24  or unreliable.

25        5.       Rancho Lucerne did not turn out to be the successful, promising

26  development that Sarbaz and Pacific Golf portrayed to investors.  More than six years after the

27  first offering, Pacific Golf had not sold any residential lots and had not built a planned golf

28  course.  Rancho Lucerne has not generated any revenue to repay investors.  Instead, investors in

two early offerings were repaid only by the issuance of additional securities to investors.
Moreover, the land that Sarbaz and his affiliates pledged as additional security for these offerings
was woefully inadequate as a source for repayment.

6. Defendants Sarbaz, Pacific Golf, and other entities controlled by Sarbaz,
received more than $13 million in cash and $6 million in securities from these offerings. Now,
however, Pacific Golf is in default on interest or principal payments on over $46 million in
securities. The Commission seeks an injunction against future conduct that violates the
securities laws, disgorgement of ill-gotten gains, and civil penalties.

## III.    THE DEFENDANTS

7. **Pacific Golf Community Development, LLC** ("Pacific Golf") is a
California limited liability company.

8. **Manoucher Sarbaz**, a resident of Los Angeles, California, is the
Managing Member of Pacific Golf and its sole employee.

9. **Lee Andrew Hill** is a resident of Little Rock, Arkansas, and is a
professional real estate appraiser. He is a member of the Appraisal Institute and is licensed as an
appraiser by the State of Arkansas. During the events described in this Complaint, Hill was
either licensed as an appraiser by the State of California or had a temporary certificate to perform
appraisal services in California.

## IV.    THE DEVELOPMENT AND THE DEVELOPER

10. Rancho Lucerne is a 1375-acre site in an area known as Lucerne Valley,
which is located approximately 50 miles northeast of the City of San Bernardino in an isolated,
rural, and sparsely unpopulated area on a high desert plateau. Historically, the Rancho Lucerne
site has been used for growing alfalfa and cattle ranching, and, until 1995, was zoned for
agricultural use.

11. In the late 1980s, Sarbaz began acquiring the parcels comprising Rancho
Lucerne. Sarbaz acquired the parcels in the names of companies and limited partnerships that he
and various family members owned and controlled, known as Monaco Treasures, Inc., Lucerne
Valley Partners, Wilshire Road Partners, and Club View Partners. Sarbaz and his family

1 members later formed Lucerne Valley LLC, Wilshire Road LLC, Makasa LLC and Club View

2 LLC, respectively, to replace these entities, and to assume ownership of Rancho Lucerne.

3         12.     The Sarbaz entities paid on average about $1,564 per acre for the land for

4 a total of about $2.132 million, for the Rancho Lucerne lands.

5         13.     Sarbaz's plan for developing the Rancho Lucerne site was to improve the

6 barren, undeveloped agricultural land so that it was in a "ready to build" state for homebuilders

7 who specialize in multiple unit residential projects ("merchant builders"). Under the

8 development plan, Sarbaz's firm, Pacific Golf, was to oversee the construction of two types of

9 improvements: (1) backbone infrastructure improvements, consisting of roads, sewage lines and

10 treatment facilities, utilities, and water lines; and (2) in-tract improvements, i.e., utility lines,

11 sewage and grading on each individual home site.  Sarbaz also intended to construct a public golf

12 course at Rancho Lucerne to attract homebuyers.

13         14.     Once the backbone and in-tract improvements were completed, Sarbaz

14 intended to sell groups of lots to merchant builders in phases.

15         15.     In approximately 1992 or 1993, Sarbaz retained Hill to prepare an

16 appraisal report on Rancho Lucerne, as part of an unsuccessful attempt to obtain private

17 financing for Rancho Lucerne.  Hill, at that time, was living in Long Beach, California, and was

18 a state-licensed appraiser.

19 **V.    THE RANCHO LUCERNE SECURITIES OFFERINGS**

20         16.     In 1995, while seeking financing for Rancho Lucerne, Sarbaz contacted

21 David Fitzgerald, an investment banker and the Chairman of Pacific Genesis Group, Inc.

22 ("Pacific Genesis"), a municipal securities underwriter and dealer located in Alameda,

23 California.  Fitzgerald and Pacific Genesis eventually formulated a plan by which the backbone

24 infrastructure improvements for Rancho Lucerne could be financed through the sale of

25 purportedly tax-exempt municipal securities issued by a local governmental entity pursuant to

26 California law.

27         17.     Under federal law, securities offered by state or local governmental

28 entities are exempt from the registration provisions of the Securities Act.  As a result, the

1 offering documents for such securities are not filed with the Commission, nor does its staff

2 review them. No Rancho Lucerne securities were registered with the Commission.

3       18. Between August 1, 1996, and continuing until December 29, 2000, there

4 were nine offerings of municipal securities concerning Rancho Lucerne by public entities and

5 associations. In connection with each offering, a written offering document, called an "official

6 statement," was prepared to describe the securities being offered. The official statement was sent

7 to brokers and to persons who purchased the Rancho Lucerne securities.

8       19. Sarbaz and Pacific Golf provided information for and reviewed each

9 Rancho Lucerne official statement before it was circulated to investors, and they were

10 responsible for ensuring the accuracy of information concerning themselves and the Rancho

11 Lucerne development that was included in each official statement. In connection with each

12 offering, Sarbaz made a written representation to the issuer that he had reviewed the draft official

13 statement and vouched for the accuracy of that information.

14       20. Hill was also involved in providing information for inclusion in each

15 official statement. Between February 1, 1996, and December 26, 2000, Hill prepared nine

16 appraisal reports and letter opinions in connection with the offerings. Hill prepared these reports

17 and letters at Sarbaz's request, knowing that Sarbaz and Pacific Genesis were summarizing them

18 in, or including them as attachments to, the Rancho Lucerne official statements. Hill prepared

19 these reports and letters with the express purpose of assisting Sarbaz and Pacific Golf in

20 obtaining financing for Rancho Lucerne.

21       21. Hill was licensed by the State of California when he prepared his appraisal

22 reports and letter opinions on Rancho Lucerne. He was also a Member of the Appraisal Institute.

23 As an appraiser licensed in the State of California, and as a Member of the Appraisal Institute,

24 Hill had a duty to competently perform appraisal services. His duties in performing appraisal

25 services included, but were not limited to, understanding the intended use of the appraisal,

26 accurately describing the methods used for appraising the subject property, performing the

27 appraisal in accordance with the described methodology and standards adopted by the Appraisal

28 Institute, accurately identifying any underlying assumptions, and presenting the appraisal in a

COMPLAINT                           5
S.E.C. v. Sarbaz

1   written report that was not misleading. As an appraiser providing written statements for

2   inclusion in an official statement in support of a municipal securities offering, Hill had a duty to

3   ensure that his written statements were neither false nor materially misleading.

4        22.    Through eight of the nine offerings, defendants Sarbaz, Pacific Golf and

5   other entities controlled by Sarbaz, received more than $13 million in cash and $6 million in

6   securities from the sale of the Rancho Lucerne securities to investors. Sarbaz, in turn, paid Hill

7   with proceeds that he received from the sale of the Rancho Lucerne securities, paying Hill at

8   least $80,000 in total.

9        23.    The proceeds of the ninth offering were refunded to investors pursuant to a

10  court order. On December 27, 2000, the Commission filed an action for securities law violations

11  against Fitzgerald and Pacific Genesis in the Northern District of California, <u>Securities and</u>

12  <u>Exchange Commission v. Fitzgerald</u>, Case No. C-00-4802 CRB. On February 14, 2001,

13  following trial, the District Court found that the official statement for the ninth offering

14  misrepresented material facts and made material omissions and therefore ordered that all of the

15  proceeds of that offering be returned to investors.

16      **A.**    **The First Offering: 1996 Lucerne Notes**

17       24.    On August 1, 1996, the Lucerne Valley Public Financing Authority (the

18  "Lucerne Valley PFA") issued $4,430,000 in securities called the "1996 Series A Revenue Notes

19  (Tax Exempt)" ("1996 Lucerne Notes"). The 1996 Lucerne Notes matured one year later on

20  August 1, 1997.

21       25.    The 1996 Lucerne Notes Official Statement ("OS") stated that the

22  securities were issued for the purpose of enabling the Lucerne Valley PFA to acquire 124 acres

23  of land located within Rancho Lucerne from an affiliate of the developer for use as a school and

24  park site. As security, the property owners (two limited partnerships controlled by Sarbaz)

25  granted a first deed of trust on 480 acres in the Rancho Lucerne development to the Lucerne

26  Valley PFA for the benefit of the note holders.

27       26.    The 1996 Lucerne Notes OS stated that the notes would be paid only from

28  revenue derived from the Project.

1         27.   At closing, the Lucerne Valley PFA paid $3,430,000 to Wilshire Partners,

2  a limited partnership in which Sarbaz was the general partner, for the acquisition of 124 acres

3  (approximately $28,000/acre).

4         28.   The 1996 Lucerne Notes OS contained the following false and misleading

5  statements and omissions:

6         29.   **Cash Flows To Repay Notes From Lot Sales.**  The 1996 Lucerne Notes

7  OS contained false and misleading information concerning the prospect for sales of the lots

8  under development.  The OS represented that Pacific Golf would provide the Lucerne PFA with

9  sufficient funds to repay the Lucerne Notes, and that Pacific Golf was "expected to execute

10  contracts with Merchant Builders . . . for the purchase of lots within the Project to generate

11  sufficient cash flows to pay and interest to the Authority."  The 1996 Lucerne Notes OS also

12  contained a chart projecting that Pacific Golf would generate $6.433 million from lot sales in

13  1997, with sufficient resulting cash flows to repay the 1996 Lucerne Notes.  The representations

14  concerning lot sales were false and lacked any reasonable basis.  Prior to the offering, a real

15  estate consulting firm reported to Sarbaz that it would take two and one-half to three years before

16  Pacific Golf would be able to sell lots and generate revenue from the Project.  The

17  representations in the OS concerning lot sales were material because lot sales were the primary

18  source for payment of the 1996 Lucerne Valley Notes and Pacific Golf had, at that time, no other

19  prospective sources of income with which to pay investors.

20         30.   **Background And Experience Of The Developer.**  The 1996 Lucerne

21  Notes OS contained false and misleading information concerning the background and experience

22  of the developer and its principal.  Among other things, it stated that Sarbaz had "over 16 years

23  experience in real estate investment and development with emphasis on master planned

24  communities."  However, the 1996 Lucerne Notes OS failed to disclose material facts concerning

25  Sarbaz's prior financial difficulties and lack of experience as a developer of large-scale

26  residential properties.  In the early 1990s, Sarbaz caused at least four businesses he controlled to

27  file for bankruptcy, as part of an effort to avoid repaying creditors who had lent him some of the

28  funds that he used to purchase Rancho Lucerne.  Two of these entities, Club View Partners and

COMPLAINT                7
S.E.C. v. Sarbaz

1  Wilshire Road Partners, also owned sizeable portions of Rancho Lucerne (approximately two-
2  thirds of the total acreage). In addition, Sarbaz had no prior experience developing large master
3  planned communities. At that time, Sarbaz's real estate development experience consisted of
4  developing small abandoned gas station sites in urban Los Angeles into strip malls, developing
5  one 30,000 square foot office building, and assisting another business partner in locating
6  investors to provide the seed money to purchase large-scale residential developments from the
7  Resolution Trust Corporation at foreclosure auctions. None of the large-scale developments was
8  ever successfully completed while Sarbaz was affiliated with them. The bankruptcies of
9  Sarbaz's other businesses and his lack of experience as a large-scale residential real estate
10 developer were material because they reflected negatively on the ability of Sarbaz, Pacific Golf
11 and Sarbaz's other companies to fulfill their obligations on the Project.

12      31. **Hill's Valuation Of The Underlying Property.** The 1996 Lucerne Notes
13 OS contained false and misleading information concerning the value of Rancho Lucerne property
14 the issuer would acquire with the proceeds of the offering and property pledged as security for
15 repayment of the notes. The OS represented that the Rancho Lucerne property had an appraised
16 value of $28,000 per acre. The Official Statement summarized an August 1, 1993 appraisal
17 report that Hill had prepared and a letter from Hill dated February 28, 1996, purporting to update
18 that appraisal. According to the Official Statement, Hill opined that 777 acres of land in Rancho
19 Lucerne was worth $28,000 per acre, which "equates to an As Is, bulk, undiscounted value of
20 $38,276,000," and that the "highest and best possible use" of Rancho Lucerne was "Planned,
21 residential, mixed use development."

22      32. Hill knew that his 1993 and February 28, 1996 appraisal reports were to be
23 summarized and included in the 1996 Lucerne Valley Notes OS, and consented to that use.

24      33. Hill's representations in the appraisal report and letter were false and
25 misleading and lacked any reasonable basis. Contrary to the statement quoted from Hill's
26 February 28, 1996 letter, that he valued the property "As Is," he did not do so. Instead, Hill
27 assumed (without so stating) that Pacific Golf had received all government approvals needed to
28 develop and sell the property ("entitlements"). Pacific Golf never obtained such entitlements.

COMPLAINT
S.E.C. v. Sarbaz

8

1  Hill's 1993 appraisal report falsely stated that the report had been prepared in conformity with
2  the professional standards of the Appraisal Foundation and Appraisal Institute. Contrary to that
3  statement, Hill's report failed to comply with such standards by failing to state the intended use
4  of the appraisal, failing to state extraordinary assumptions, and failing to perform a proper
5  feasibility analysis to determine the highest and best possible use of the property.

6       34.    Hill's valuation of the Rancho Lucerne property was material because 480
7  acres of that property were pledged as security for the notes and the issuer would acquire 142
8  acres with the proceeds of the notes.

9       35.    As of August 1, 1996, Pacific Golf and Sarbaz knew, or recklessly
10 disregarded, facts indicating that Hill's appraisal report and letter, and the summary of the
11 appraisal materials in the OS, overstated the value of the Rancho Lucerne property. Before the
12 1996 Lucerne Notes were sold to investors, Sarbaz had received a consultant's report challenging
13 the appraisal and stating that the land might be worth only $3,000 per acre. Sarbaz failed to
14 require that this information be included in the 1996 Rancho Notes OS.

15      36.    The 1996 Lucerne Notes were not repaid by the sale of lots as represented
16 in the Official Statement. In August 1997, the 1996 Lucerne Notes were retired using the
17 proceeds of the third Rancho Lucerne offering.

18 **B.    The Second Offering: 1996 Rancho Notes**

19      37.    On December 31, 1996, the Rancho Lucerne Valley Public Financing
20 Authority (the "Rancho Lucerne PFA") issued a $3,750,000 offering of 1996 Revenue Notes
21 ("1996 Rancho Notes"). The 1996 Rancho Notes matured on December 1, 1999.

22      38.    The 1996 Rancho Notes OS stated that the purpose of the offering was to
23 enable the Rancho Lucerne PFA to acquire 86 acres from an affiliate of Pacific Golf for
24 purported public uses. The 1996 Rancho Notes were secured solely by land from the Rancho
25 Lucerne development (a first deed of trust on 197 acres, and a second deed of trust in the amount
26 of $1,000,000 on the 480 acres pledged in the earlier offering) and by monies pledged by Pacific
27 Golf to the Rancho Lucerne PFA to repay the 1996 Rancho Notes.

28

1          39.    The 1996 Rancho Notes OS contained the following false and misleading

2  statements and omissions:

3          40.    **Background And Experience Of The Developer.** The 1996 Rancho

4  Notes OS contained the same false and misleading description of the background and experience

5  of Sarbaz and Pacific Golf that appeared in the 1996 Lucerne Notes OS, because it failed to

6  disclose the same material information on that subject. Plaintiff realleges and incorporates by

7  reference the allegations of paragraph 30 above as though alleged with respect to the 1996

8  Rancho Notes.

9          41.    **Hill's Valuation Of The Underlying Property.** The 1996 Rancho Notes

10  OS contained false and misleading information concerning the value of Rancho Lucerne property

11  the issuer would acquire with the proceeds of the offering and property pledged as security for

12  repayment of the notes. The 1996 Rancho Notes OS quoted from Hill's August 1, 1993

13  appraisal report that the market value of Rancho Lucerne was "$28,000 per gross acre" and that

14  the highest and best use of Rancho Lucerne was "planned, residential, mixed use development."

15  Hill's representations in that appraisal report were materially false and misleading for the reasons

16  set forth in paragraphs 31 through 36 above.

17          42.    The 1996 Rancho Notes OS also quoted from Hill's narrative appraisal

18  report dated October 22, 1996, and Hill's letter dated November 12, 1996, stating that Rancho

19  Lucerne was valued "with current entitlements" and "with entitlements," respectively, at

20  "$28,000 per gross acre." Hill knew that the appraisal report and letter were to be summarized

21  and included in the 1996 Rancho Notes OS, and consented to that use.

22          43.    The October 22, 1996 appraisal report and the November 12, 1996 letter

23  were materially false and misleading, and lacked any reasonable basis. Contrary to Hill's

24  representations, he did not value the property "with current entitlements" or "with entitlements."

25  Instead, Hill assumed (without so stating) that Pacific Golf had received all entitlements

26  necessary to develop the property. Pacific Golf never obtained such entitlements. The October

27  22, 1996 appraisal report falsely stated that the report was prepared in conformance with the

28  professional standards of the Appraisal Foundation and the Appraisal Institute. Contrary to that

COMPLAINT                  10
S.E.C. v. Sarbaz

1    statement, Hill's report failed to comply with such professional standards by failing to state the

2    intended use of the appraisal, failing to state extraordinary assumptions, and failing to perform a

3    proper feasibility analysis to determine the highest and best possible use of the property.

4              44.    Sarbaz, Pacific Golf and Hill each knew, or recklessly disregarded, that

5    the appraisals summarized in the 1996 Rancho Notes OS were materially false and misleading.

6    Before the offering closed, a representative of the Lucerne Valley School District, one of the

7    members of the Rancho Lucerne PFA, challenged Hill's appraisals and provided information that

8    the Rancho Lucerne property was worth no more than $5,000 per acre.  Sarbaz and Hill were

9    aware of this information and failed to require that the information be included in the 1996

10   Rancho Notes OS.  Sarbaz also knew that the real estate consulting firm he had commissioned to

11   perform due diligence on Rancho Lucerne had opined that Rancho Lucerne was worth much less

12   than Hill's valuation, possibly no more than $3,000 per acre.  Sarbaz failed to require that the

13   information be included in the 1996 Rancho Notes OS.

14        **C.    The Third Offering: 1997 Rancho Bonds**

15             45.    On July 31, 1997, the Rancho Lucerne Valley PFA issued $9,550,000 of

16   Series A Revenue Bonds in connection with the Rancho Lucerne development ("1997 Rancho

17   Bonds").  The bonds matured at various dates between July 1, 1998 and July 1, 2003.

18             46.    The 1997 Rancho Bonds OS stated that the purpose of the offering was to

19   redeem in full the 1996 Lucerne Notes, to redeem or purchase in lieu of redemption $1,000,000

20   of the 1996 Rancho Notes, and to provide $1,000,000 in funds for the construction of certain

21   public improvements associated with Phase I of the Rancho Lucerne Project.  The 1997 Rancho

22   Bonds were described as limited special obligations of Rancho Lucerne PFA that would be

23   repaid only from Project revenue or from proceeds resulting from the foreclosure sale of any

24   security, and would not be paid from any other assets of the issuer or its constituent members.

25   The 1997 Rancho Bonds were secured by a pledge from Pacific Golf to the Rancho Lucerne PFA

26   to repay the bonds from future Project revenue and by a first deed of trust on 480 acres of

27   Rancho Lucerne property.

28

COMPLAINT                                11
S.E.C. v. Sarbaz

1    47.    The 1997 Rancho Bonds OS contained the following false and misleading

2    statements and omissions:

3    48.    **Background And Experience Of The Developer.**    The 1997 Rancho

4    Bonds OS contained the same false and misleading description of the background and experience

5    of Sarbaz and Pacific Golf that appeared in the 1996 Lucerne Notes OS, because it failed to

6    disclose the same material information on that subject.    Plaintiff realleges and incorporates by

7    reference the allegations of paragraph 30 above as though alleged with respect to the 1997

8    Rancho Bonds.

9    49.    **Cash Flows To Repay Notes From Lot Sales.**    The 1997 Rancho Bonds

10   OS misrepresented the likelihood that Pacific Golf would be able to repay the 1997 Rancho

11   Bonds from Project revenue.    The 1997 Rancho Bonds OS contained projections of lot sales and

12   revenue, prepared by Pacific Golf, stating that Pacific Golf would sell 317 lots within one year,

13   and all Phase I lots within four years, resulting in revenue of $6,378,000 during 1998, and total

14   revenue of $29,364,000 by 2001 – revenue which would be sufficient to make interest payments

15   due on the 1996 Rancho Lucerne Notes and the 1997 Rancho Bonds, and to repay both of these

16   notes and bonds when due.    However, these projections lacked a reasonable basis when made.

17   As of July 31, 1997, Pacific Golf did not have the financial resources to build the public capital

18   improvements required before lots could be sold, had not received any contracts from merchant

19   builders, and had not received San Bernardino County's approval to subdivide and sell Rancho

20   Lucerne parcels.

21   50.    Sarbaz and Pacific Golf knew, or recklessly disregarded, that these

22   projections concerning lot sales and revenue lacked a reasonable basis when they made them.

23   Sarbaz had submitted materially different, and much lower, projections of lot sales to San

24   Bernardino County earlier that month, showing that Pacific Golf did not anticipate selling all of

25   the Phase 1 lots for at least 10 years.

26   51.    Sarbaz's lot sales projections included in the 1997 Rancho Bonds OS were

27   material because investors depended upon Pacific Golf's ability to sell lots as their primary

28   source of repayment.

COMPLAINT                              12
S.E.C. v. Sarbaz

52. **Hill's Valuation Of The Underlying Property.** The 1997 Rancho Bonds OS contained material misrepresentations and omissions concerning the value of land pledged as security for the 1997 Rancho Bonds. The 1997 Bond OS summarized a July 1, 1997 appraisal report that Hill prepared, and stated that the "'As Is' Land value with entitlements" of the Rancho Lucerne land pledged as security for the 1997 Rancho Bonds was "$28,000 per acre" and that the pledged property had "an undiscounted value of $12,600,000." The 1997 Rancho Bonds OS included in an appendix a letter from Hill dated July 9, 1997 stating that "it is the appraiser's opinion, . . . that Phase I of Rancho Lucerne will sell out within six (6) years" and that his opinion was prepared in conformance with professional standards. Hill prepared the report and letter with the knowledge that they would be summarized or included in the 1997 Rancho Bonds OS, and consented to this use.

53. Each of Hill's statements set forth above was materially false and misleading and lacked a reasonable basis. Contrary to Hill's representations, he did not value the property "As Is." Instead, Hill assumed (without so stating) that Pacific Golf had received all entitlements necessary to develop the property. Pacific Golf never obtained such entitlements. In both the July 1, 1997 appraisal report and July 9, 1997 letter, Hill falsely stated that they were prepared in conformity with professional standards of the Appraisal Foundation and Appraisal Institute. Contrary to these statements, Hill's report failed to comply with such professional standards by failing to state extraordinary assumptions, failing to identify known restrictions on use of the property, failing to perform a proper feasibility analysis to determine the highest and best possible use of the property, failing to analyze available cost data, and failing to analyze available expense data.

54. Sarbaz and Pacific Golf knew, or recklessly disregarded, that the appraisal information contained in the 1997 Rancho Bonds OS was materially false and misleading. Sarbaz knew the objections to Hill's valuation raised in December 1996 by a representative of the Lucerne Valley School District (described above), and opinions of value provided by his consultant. Sarbaz also knew, or was reckless in not knowing, that Hill premised his conclusions on materially inaccurate development cost and estimated lot absorption rates. (A

1    "lot absorption rate" is an expression of the number of lots that have been or will be sold in a

2    given period of time, usually projected into the future.)

3         **D.      The Fourth Offering:  1998 Rancho Bonds**

4              55.      On August 1, 1998, the Rancho Lucerne Valley PFA issued $10.2 million

5    of "Revenue Bonds Series A" in connection with the Rancho Lucerne Development (the "1998

6    Rancho Bonds").  The bonds matured July 15, 2003.

7              56.      The 1998 Rancho Bonds OS stated that the bonds would be repaid from

8    fees imposed upon the property owner of the lots in Phase I (Wilshire Road or its successors) in

9    consideration for benefits the property owner would receive from the construction of the public

10   capital improvements.

11             57.      The 1998 Rancho Bonds OS contained the following false and misleading

12   statements and omissions:

13             58.      **Cash Flows To Repay Bonds From Lot Sales And Golf Course**

14   **Operations.**  The 1998 Rancho Bonds OS contained false and misleading information

15   concerning the schedule for development of the residential lots and golf course at Rancho

16   Lucerne.  The OS stated, in part: "The Developer anticipates that the first finished lots will be

17   ready for sale in the Spring of 1999.  The first homes could be completed and ready for

18   occupancy in September of 1999. . . .  The Developer anticipates that the first 18 holes of the

19   Public Golf Course will be open for play in September of 1999 to coincide with the Residential

20   Development."  The 1998 Rancho Bonds OS further stated that Pacific Golf "anticipates fully

21   retiring the 1997 Rancho Bonds from lot sales proceeds during 2000, and thereafter having

22   sufficient Project Impact Reimbursement Fees available to fully debt service the Bonds."  These

23   statements lacked any reasonable basis and were false and misleading when made.  Sarbaz had

24   submitted projections to San Bernardino County in July 1997 that the development would take

25   much longer.  The statements concerning the development schedule were material because they

26   gave assurance that Pacific Golf could generate sufficient revenue from the sale of lots and

27   operation of the golf course to pay interest and principal on the bonds when due.

28

59.  **Construction Contracts.** The 1998 Rancho Bonds OS also falsely represented that Pacific Golf had entered into three significant contracts with third parties to provide construction services for the Project. The 1998 Rancho Bonds OS stated that the developer had retained Kiewit Pacific Corp. ("Kiewit") to serve as the general contractor and that, pursuant to a contract with Kiewit, Kiewit agreed to provide financing to Pacific Golf for the $12.4 million in "in-tract" improvements that had to be constructed before finished lots could be sold. The 1998 Rancho Bonds OS also stated that Pacific Golf had entered into a contract with Forsgren Associates, Inc. ("Forsgren") to build the public golf course facilities.

60.  Contrary to the statements in the OS, Kiewit did not enter into a contract with Pacific Golf to serve as the general contractor until late August 1998. Indeed, Pacific Golf used proceeds it received from the sale of the 1998 Rancho Bonds OS to pay for a performance bond that Kiewit required before it would serve as a general contractor. In addition, Kiewit never agreed to provide financing for construction of the in-tract improvements required for Phase I. Contrary to the statements concerning Forsgren, that company did not agree to serve as the golf course contractor for Pacific Golf until December 1998, four months after the bonds were sold.

61.  The statements concerning constructions contracts with Kiewit and Forsgren were material because they provided assurance that the development of the residential areas and golf course at Rancho Lucerne was advancing. The statements concerning financing by Kiewit were material because in-tract improvements, unlike public capital improvements, are not eligible for tax-exempt financing and thus Sarbaz could not rely on offerings underwritten by Pacific Genesis to finance them. Pacific Golf also was required to construct the in-tract improvements before it could sell developed lots to merchant homebuilders and thus repay purchasers of the 1998 Rancho Bonds. Pacific Golf had no other source of financing and no ability to pay for construction of the in-tract improvements.

62.  **Hill's Valuation Of The Underlying Property.** The 1998 Rancho Bonds OS contained the same material misrepresentations and omissions concerning the value of land pledged as security as the OS for the 1997 Rancho Bonds. Plaintiff realleges and incorporates by

1  reference the allegations of paragraphs 52 through 54 above as though alleged with respect to the

2  1998 Rancho Bonds.

3  **E.  The Fifth Offering: 1999 Chimney Rock Certificates**

4  63.  On December 31, 1999, the Chimney Rock Community Association

5  ("Chimney Rock") issued $5.875 million of "Certificates of Participation 1999 Series B" ("1999

6  Chimney Rock Certificates"). The securities matured December 1, 2002.

7  64.  The 1999 Chimney Rock Certificates OS stated that the securities were

8  issued (1) to enable Chimney Rock and another public entity to acquire and construct certain

9  public capital improvements valued at $900,000; (2) to acquire, from an affiliate of Pacific Golf,

10  48 acres of open space, parks, rights-of-ways and landscape easements valued at $28,000 per

11  acre; and (3) to refund the outstanding balance of $2.75 million of the 1996 Rancho Notes.

12  65.  The 1999 Chimney Rock Certificates OS contained the following false

13  and misleading statements and omissions:

14  66.  **Cash Flows To Repay Certificates From Lot Sales.** The 1999 Chimney

15  Rock Certificates OS provided false and misleading information concerning the schedule for lot

16  sales. The OS stated that fully entitled lots in Phase II property (Area 34) would be available for

17  sale by August 2000 and that the "first homes could be completed and ready for occupancy by

18  November 2000," and that the first 20 holes of a public golf course "will be open for play in the

19  Summer of 2000." The OS further stated that Pacific Golf "anticipates fully retiring" the 1999

20  Chimney Rock Certificates "by the end of the year 2002 from the proceeds of the sale of lots."

21  67.  The 1999 Chimney Rock Certificates OS stated that "in June of 1999, one

22  of the Property Owners entered into a contract to sell Area 34 to Colony Associates L.L.C.

23  ("Colony") for $3,750,000," that this contract would have generated net revenue of

24  approximately $2,800,000, that the "net revenues would have allowed the Developer to make

25  required payments of $128,554 per acre on the lots within Area 34," and that, although the

26  contract was rescinded when construction was delayed, Pacific Golf "has offered to extend the

27  contract with Colony and anticipates that the transaction will proceed when construction can

28  resume."

COMPLAINT                                  16
S.E.C. v. Sarbaz

68.     Each of the statements identified in the preceding two paragraphs were false and misleading, and lacked any reasonable basis when made.  The statements regarding new homes being built by November 2000, and the developer's purported intention to repay the Chimney Rock Certificates by quickly developing the Phase II property, rested upon assumptions that Sarbaz had no reason to believe were true – that Pacific Golf would immediately receive sufficient funds to develop this additional property as well as the Phase I property, and that Pacific Golf would receive approval from San Bernardino to begin subdividing and selling these lots.   To the contrary, Pacific Golf did not expect to receive funds at closing that would enable it to pay for new construction work, either on Phase I or Phase II, and did not have approvals required to subdivide and sell the lots to merchant homebuilders.

69.     The statements in the 1999 Chimney Rock Certificates OS regarding the purported contract with Colony were false and misleading when made because Colony was not a merchant builder (but rather was a limited liability company formed by a timeshare salesman), Colony's contract only granted it an option to purchase the lots (it did not require Colony to do so), Colony did not have the ability to pay for the lots described in the contract, and Sarbaz had paid Colony's principal to sign the contract.

70.     The statements in the OS concerning lot sales were material because purchasers of the 1999 Chimney Rock Certificates would only be repaid if Pacific Golf were able to sell these lots successfully by December 1, 2002 (when the 1999 Chimney Rock Certificates matured), and at prices sufficient to repay encumbrances placed on each lot.  The statements regarding a contract with Colony provided assurance that Pacific Golf could generate sufficient revenue to repay the 1999 Chimney Rock Certificates from the sale of lots.

71.     Sarbaz and Pacific Golf knew, or recklessly disregarded, that the statements concerning lot sales, identified above, were false and misleading and lacked any reasonable basis when the statements were made.

72.     **Entitlements To Develop The Property.**  The 1999 Chimney Rock Certificates OS contained false and misleading information concerning entitlements to develop and sell the property.  The OS stated that San Bernardino had approved a Final Development

1  Plan and the Master Tentative Tract Map for the Project and that Pacific Golf had submitted tract

2  maps for five of the fourteen Project phases to San Bernardino on October 8, 1999.

3           73.     The statements identified in the preceding paragraph were false and

4  misleading.  On October 8, 1999, San Bernardino County had tentatively rejected Pacific Golf's

5  tract maps because Pacific Golf did not file the final Master Tentative Tract Map, and because of

6  a conflict between Pacific Golf and the County's Special District Office over who was to supply

7  water to Rancho Lucerne.  The rejection of these maps meant that Pacific Golf could not sell any

8  subdivided parcels to homebuilders to help retire debt.

9           74.     The statements concerning entitlements were material because they

10  described the completion of certain acts needed to obtain the County's approval to develop the

11  property.  The statements provided assurance that Pacific Golf would be able to develop lots, sell

12  them to merchant homebuilders and thus generate sufficient revenue to repay investors.

13          75.     Sarbaz knew, or recklessly disregarded, facts indicating that these

14  statements regarding entitlements were false and misleading when made.

15          76.     **Certificate of Developer.**  The 1999 Chimney Rock Certificates OS

16  contained a false and misleading Certificate of the Developer, dated December 30, 1999 and

17  signed by Sarbaz.  In the Certificate, Sarbaz stated that the OS and preliminary OS "do not

18  contain any untrue statement of material fact or omit to state a material fact required to be stated

19  therein or necessary to make the statements therein, in light of the circumstances under which

20  they were made, not misleading."  Sarbaz also stated that he, Pacific Golf, and Rancho Lucerne

21  were not subject to any lawsuits or threatened lawsuits or investigations, or inquiries, either

22  "involving the Developer" or "involving the Project wherein an unfavorable decision, ruling or

23  finding would materially and adversely affect" either the "Developer's ability to perform the

24  tasks contemplated" in the OS or the "viability of the Project," or in which the Developer was "a

25  named defendant," except as disclosed in the certificate.

26          77.     Sarbaz's representations in the Certificate of the Developer were false

27  when made.  In August 1999, the general contractor of the Project, Kiewit, filed a $3.4 million

28  mechanic's lien against property securing the 1998 Rancho Bonds. In November 1999, Kiewit

COMPLAINT
S.E.C. v. Sarbaz

18

1 | filed an action to foreclose on the mechanic's lien, and thereby jeopardized a large portion of the
2 | development.

3 |         78.     Sarbaz's representations in the Certificate of the Developer were material
4 | because lawsuits that threatened the title to Rancho Lucerne property, or Pacific Golf's ability to
5 | develop the property, could affect Pacific Golf's ability to repay purchasers of the 1999 Chimney
6 | Rock Certificates.

7 |         79.     Sarbaz knowingly or recklessly omitted to disclose Kiewit's lien and
8 | lawsuit in the Certificate and the 1999 Chimney Rock Certificates OS, and knowingly or
9 | recklessly misrepresented that he had, in fact, disclosed all lawsuits required in the Certificate of
10 | the Developer.

11 |         80.     **Hill's Valuation of the Underlying Property.** The 1999 Chimney Rock
12 | Certificates OS contained false and misleading information concerning the value of the Rancho
13 | Lucerne property. The OS summarized Hill's appraisal report dated October 22, 1996 and a
14 | letter from Hill dated November 16, 1999. Attached to the OS as an appendix were copies of the
15 | transmittal letter for the October 22, 1996 appraisal report and the November 16, 1999 letter.
16 | The October 22, 1996 appraisal report stated an opinion of market value, "with entitlements," for
17 | 1,367 acres of Rancho Lucerne of $28,000 per acre. The November 16, 1999 letter stated an
18 | opinion of market value, "As Is," for 467 lots on 92 acres within the same development of
19 | $11,139,000, or $23,850 per lot. The OS further stated that, based upon these valuations, the
20 | security property and Chimney Rock's public lands were worth $6,356,000 as of November 12,
21 | 1996. Hill knew that the appraisal report and letter would be summarized and included in the
22 | 1999 Chimney Rock Certificates OS, and consented to that use.

23 |         81.     The October 22, 1996 appraisal report and the November 16, 1999 letter
24 | were materially false and misleading, and lacked any reasonable basis. Contrary to Hill's
25 | representations, he did not value the property "with entitlements" and "As Is." Instead, Hill
26 | assumed (without so stating) that Pacific Golf had received all government entitlements
27 | necessary to develop and sell the property. Pacific Golf never obtained such entitlements. Both
28 | the appraisal report and the letter falsely stated that they were prepared in conformance with the

professional standards of the Appraisal Foundation and the Appraisal Institute.  Contrary to these representations, Hill's appraisal report and letter failed to comply with such standards by failing to state extraordinary assumptions, failing to perform a proper feasibility analysis to determine the highest and best possible use of the property, failing to analyze available cost data, and failing to analyze available expense data.

82.    Hill, Sarbaz and Pacific Golf knew, or recklessly disregarded, facts indicating that Hill's October 22, 1996 appraisal report and November 16, 1999 letter opinion were false and misleading and lacked a reasonable basis.  Hill and Sarbaz had materially different estimated lot development cost information that undermined the basis for Hill's valuation.

**F.    The Sixth Offering:  2000 Chimney Rock Bonds**

83.    On January 19, 2000, Chimney Rock issued $14,500,000 of "Lease Revenue Bonds Series A" (the "2000 Chimney Rock Bonds").  The bonds matured on four different dates between June 15, 2001 and December 15, 2004.

84.    The 2000 Chimney Rock Bonds OS stated that the purpose of the offering was to enable Chimney Rock and another public entity to (1) acquire and/or construct public capital improvements associated with Phase I of the development valued at $4.8 million; (2) acquire 52 acres of property for landscape easements valued at $28,000 per acre; (3) redeem $1.94 million of the 1997 Rancho Bonds and fund an interest payment on such bonds due on January 1, 2000; and (4) redeem $2.07 million of the 1998 Rancho Bonds and fund an interest payment on such bonds due on January 1, 2000.

85.    The security offered for the 2000 Chimney Rock Bonds was Project Impact Reimbursement Fees of $14.5 million secured by liens on approximately 334 acres in the Phase I development.  Approximately $8.2 million of the total was secured by liens on Rancho Lucerne property that were senior to other outstanding encumbrances, while $6.3 million was secured by liens that were junior to those imposed as security for the 1997 Rancho Bonds and the 1998 Rancho Bonds.

86. The 2000 Chimney Rock Bonds OS contained the following false and misleading statements and omissions:

87. **Cash Flows To Repay Bonds From Lot Sales And Golf Course Operations.** The 2000 Chimney Rock Bonds OS contained false and misleading information concerning revenue from lot sales and operation of the Rancho Lucerne golf course. The OS contained projections, prepared by Sarbaz, purporting to show that revenue derived from the sale of lots would be sufficient to repay all of the prior indebtedness. The OS stated that "lots will be ready for sale by March or April 2000 and homes will be ready for occupancy by August 2000" and that Pacific Golf "anticipates that the first 20 holes of the Public Golf Course will be open for play in the Summer or Fall of 2000 to coincide with the marketing and occupancy of the initial residential development." The OS also contained a schedule showing that Pacific Golf anticipated selling 1333 lots by 2004, and generating $53,653,000 in net revenue.

88. These statements concerning lot sales and the golf course were false and misleading, and lacked any reasonable basis when made. Pacific Golf did not have sufficient funds to pay for the remaining construction work on either the residential development or the golf course. Moreover, Pacific Golf did not have entitlements to develop the property either for residential or golf course uses.

89. These statements concerning lot sales were material in that they provided assurance that Pacific Golf could generate sufficient revenue to repay the 2000 Chimney Rock Bonds, as well as prior securities issued for the Project.

90. The 2000 Chimney Rock Bonds OS stated that "in June of 1999, the Property Owner entered into a contract to sell Area 12 to Colony Associates L.L.C. for $4,200,000," that this contract would have generated net revenues of approximately $3,000,000," that the "net revenues would have allowed the Developer to make required payments of $35,000 per lot on the 85 lots planned for Area 12," and that, although the contract was rescinded when construction was delayed, that Pacific Golf "has offered to extend the contract with Colony Associates, L.L.C. and anticipates that the transaction will proceed when construction can resume."

91.     These statements regarding the purported contract with Colony were false and misleading when made because Colony was not a merchant builder, Colony's contract only granted it an option to purchase the lots (it did not require Colony to do so), Colony did not have the ability to pay for the lots described in the contract, and Sarbaz paid Colony's principal so that he would sign the contract.

92.     The statements in the OS concerning Colony were material because they provided assurance that Pacific Golf would be able to sell residential lots and thus generate revenue for the payment of interest and principal on the bonds.

93.     Sarbaz and Pacific Golf knew, or recklessly disregarded, that all of these statements concerning lot sales and the golf course were false and misleading, and lacked any reasonable basis when made.

94.     **Entitlements To Develop The Property.**  The 2000 Chimney Rock Bonds OS made the same representations concerning entitlements to develop the property that are identified in paragraph 72 above.  Those representations were materially false and misleading for the reasons set forth in paragraphs 73 through 75 above.   Plaintiff realleges and incorporates those paragraphs as though alleged concerning the 2000 Chimney Rocks Bonds OS.

95.     **Certificate of Developer.**  The 2000 Chimney Rock Bonds OS contained a Certificate of the Developer, dated January 19, 2000 and signed by Sarbaz.  In the certificate, Sarbaz made the same representations concerning actual and threatened litigation that are identified in paragraph 76 above.  Sarbaz's statements in the certificate were materially false and misleading for the reasons set forth in paragraphs 77 through 79 above.  Plaintiff realleges and incorporates those paragraphs as though alleged concerning the 2000 Chimney Rock Bonds OS.

96.     **Hill's Valuation Of The Underlying Property.**  The 2000 Chimney Rock Bonds OS states that Hill had reported the same values for the Rancho Lucerne property in appraisal reports and letters dated August 1, 1993, February 28, 1996, October 22, 1996, November 12, 1996, July 9, 1997, June 1, 1998 and July 16, 1999.  Hill's letters dated October 22, 1996, November 12, 1996, July 9, 1997, and June 1, 1998 and excerpts from Hill's appraisal report dated July 16, 1999 were appended to the OS.  The 2000 Chimney Rock Bonds OS and

1  the 1999 appraisal report stated that the Net Present Value of Phase I of Rancho Lucerne (1,254

2  proposed lots or 480 acres) was $21,978,000, and that the Aggregate Retail Lot Value

3  (undiscounted) of that land as of completion of construction by December 1, 1999 was

4  $71,630,000.  The appraisal report also stated that, "it is the appraiser's opinion, following an

5  absorption study of competitive subdivisions and master-planned golf-course communities, that

6  Phase I of Rancho Lucerne will sell out within six (6) years after commencement of lot sales."

7  Hill represented that he prepared the 1999 appraisal report in conformance with professional

8  appraisal standards of the Appraisal Foundation and the Appraisal Institute.

9          97.    Hill prepared the June 1, 1999 appraisal report to assist Sarbaz in

10  obtaining financing from the sale of the 2000 Chimney Rock Bonds, and with the knowledge that

11  it would be included in the 2000 Chimney Rock Bonds OS, and consented to this use of his

12  report.

13          98.    Contrary to Hill's representations, his appraisal reports and letter opinions

14  referenced in the 2000 Chimney Rock Bonds OS failed to comply with the professional appraisal

15  standards by failing to state extraordinary assumptions, failing to perform a proper feasibility

16  analysis to determine the highest and best possible use of the property, failing to analyze

17  available cost data, and failing to analyze available expense data.  Furthermore, some of the

18  appraisal reports and letters referenced in and attached to the 2000 Chimney Rock Bonds OS

19  falsely represented that Hill had valued the Rancho Lucerne property "As Is."  Contrary to that

20  representation, Hill had assumed (without so stating) that Pacific Golf had received all

21  government entitlements necessary to develop and sell the property.  Pacific Golf never obtained

22  such entitlements.

23          99.    The statements in the 2000 Chimney Rock Bonds OS concerning the

24  appraised value of Rancho Lucerne were material because they provided assurance that valuable

25  land was securing the 2000 Chimney Rock Bonds and that the value of the land was rising.

26          100.   Sarbaz and Pacific Golf knew, or recklessly disregarded, that the

27  appraisal information contained in the 2000 Chimney Rock Bonds OS was materially false and

28  misleading.  In addition to the objections raised in December 1996 by a representative of the

1   Lucerne Valley School District, and the lower opinions of value expressed by consultants, Sarbaz

2   knew, or recklessly disregarded, facts indicating that Hill's conclusions were based upon

3   materially inaccurate development cost and inflated lot absorption rates.

4         **G.    The Seventh Offering: 2000 Legends A Bonds**

5         101.   On April 28, 2000, the Legends Golf Club Community Association

6   ("Legends") issued $14 million in 2000 Series A Lease Revenue Bonds ("2000 Legends A

7   Bonds"). Some of the bonds matured August 1, 2001 and other bonds had a maturity date of

8   August 1, 2010.

9         102.   The 2000 Legends A Bonds OS stated that the purpose of the offering was

10  to acquire 104 acres of land for the golf course, to acquire and construct portions of the golf

11  course, and to redeem $4,940,000 of prior offerings.

12        103.   The 2000 Legends A Bonds OS contained the following false and

13  misleading statements and omissions:

14        104.   **Cash Flows To Repay Bonds From Lot Sales and Golf Course**

15  **Operations.** The 2000 Legends A Bonds OS contained false and misleading information

16  concerning the schedule for offering residential lots for sale and for the commencement of golf

17  course operations. The OS stated that Pacific Golf anticipated that "the first 20 holes of the

18  Public Golf Course will be open for play in the Fall of 2000 to coincide with the marketing and

19  occupancy of the initial residential development." The OS stated that Pacific Golf "anticipates

20  that the first fully entitled residential Areas will be ready for sale in approximately July of 2000,"

21  that the "on-site in-tract improvements should be completed approximately 60 days later," and

22  that the "first homes could be completed and ready for occupancy in October 2000." The OS

23  also stated that Pacific Golf anticipated fully retiring the 1997 Rancho Bonds (from the third

24  offering) and the 1998 Rancho Bonds (fourth offering) by the end of the year 2002 from the

25  proceeds of sales in Areas 2, 3, 5, 10, and 11. The OS further stated that the golf course revenue

26  was the primary source for repayment of the bonds, but that fees imposed upon the property

27  owners and to be obtained from the sale of various residential lots were an additional source for

28  repayment.

105.    These statements concerning lot sales and the golf course were false and misleading, and lacked any reasonable basis when made. Pacific Golf did not have sufficient funds to pay for the remaining construction work on either the residential development or the golf course. In March 2000, San Bernardino County had stopped work on the Project. Moreover, Pacific Golf did not have entitlements to develop the property either for residential or golf course uses.

106.    These statements were material because they provided assurance that the Project would soon generate sufficient revenue, both from the sale of lots and from the operation of a golf course, to enable Pacific Golf to repay the 1997 Rancho Bonds and the 1998 Rancho Bonds, as well as the 2000 Legends A Bonds.

107.    Sarbaz and Pacific Golf knew, or recklessly disregarded, that the statements in the 2000 Legends A Bonds OS concerning lot sales and golf course operations were false and misleading and lacked any reasonable basis when made.

108.    **Hill's Valuation Of The Golf Course Property.** The 2000 Legends A Bonds OS summarized and appended a "Preliminary Letter Opinion of Land Value," prepared by Hill and dated March 1, 2000. In this letter, Hill opined that the 189 acres intended to comprise twenty holes of the golf course, as entitled, was worth $8,125,000 or $43,000 per acre. Hill's conclusions on value were entirely summary – no data or methodology was presented to show how the valuations were reached. The preliminary valuation stated that it would be "subject to the issuance of a final Self-Contained Narrative Appraisal Report" that would be prepared prior to closing. However, a final appraisal with documentation of the data relied upon and a specification of the appraisal methodology was never completed. The preliminary valuation further stated that it was "subject to" the professional appraisal standards of the Appraisal Institute.

109.    Hill prepared the preliminary letter opinion for the purpose of assisting Sarbaz in obtaining financing through the sale of the 2000 Legends A Bonds Bonds, and consented to that use of his appraisal report.

110.    Hill's preliminary letter opinion was false and misleading, and lacked any reasonable basis when made. Hill failed to comply with professional appraisal standards when he agreed to prepare the preliminary letter opinion, and consented to its use in connection with the 2000 Legends A Bonds offering, without performing the analysis required for a full appraisal report and completing such a report.

111.    The representation in the preliminary letter opinion that the golf course land was worth $43,000 per acre was material because Sarbaz had pledged the golf course property as security for the 2000 Legends A Bonds.

112.    Sarbaz, Pacific Golf and Hill each knew that the final supplemental appraisal was not prepared prior to closing. Sarbaz, Pacific Golf and Hill also knew or recklessly disregarded that Hill had not prepared any analysis to support his opinion.

**H.      The Eighth Offering: 2000 Legends B Bonds**

113.    On June 19, 2000, Legends issued $8.5 million in Lease Revenue Bonds 2000 Series B ("2000 Legends B Bonds"). The bonds matured on June 15, 2002.

114.    The 2000 Legends B Bonds OS stated that the purpose of the offering was to enable the issuer to acquire 140 acres of the prospective public golf course property for approximately $38,085 per acre. The issuer pledged to repay the 2000 Legends B Bonds with income that Pacific Golf had pledged and which it expected to derive from the profitable operation of the golf course.

115.    The 2000 Legends B Bonds OS contained Hill's "Preliminary Letter Opinion of Land Value" dated March 1, 2000, described in paragraph 108 above. The statements of appraised value contained in the OS and in the letter opinion, which was appended to the OS, were materially false and misleading for the reasons stated in paragraphs 109 through 112 above. Plaintiff realleges and incorporates by reference paragraphs 108 through 112 as though alleged with respect to the 2000 Legends B Bonds.

**I.      The Ninth Offering: 2000 Desert Tortoise Bonds**

116.    In September 1999, Rancho Lucerne PFA, which made the second, third and fourth offerings, changed its name to Desert Tortoise Public Financing Authority ("Desert

Tortoise"). On or about December 29, 2000, Desert Tortoise issued $13.5 million in Revenue

Bonds 2000 Series A ("2000 Desert Tortoise Bonds"). The bonds were issued with a maturity

date of December 15, 2004. However, the bonds were later cancelled and all investor funds were

repaid pursuant to the court order in SEC v. Fitzgerald (see paragraph 23).

117.    The 2000 Desert Tortoise Bonds OS dated December 27, 2000 stated that

the purpose of the offering was to finance construction of public improvements, acquire public

lands for the Project, and redeem the 1999 Chimney Rock Certificates offering. The OS stated

that "[t]he sole source of funds for repayment of the Bonds are Project Impact Reimbursement

Fees, which are expected to be derived in connection with the sale of entitled and/or completed

lots within the Security Property."

118.    The 2000 Desert Tortoise Bonds OS contained the following false and

misleading statements and omissions:

119.    **Cash Flows To Repay Bonds From Lot Sales To Merchant Builders.**

The 2000 Desert Tortoise Bonds OS contained false and misleading information concerning the

developer's plans to sell residential lots to merchant builders. In a section of the OS entitled

"Merchant Builder Sales," the OS represented that Colony had entered into a contract to

purchase Area 12 of the Project, and that Pacific Golf had offered to sell Area 34 to Colony and

expected that the latter transaction would proceed when Area 34 was "fully entitled and ready for

construction of improvements." The OS stated that the Developer anticipated that the sale of

Area 12 would "allow funding of the on-site in-tract improvements and generate proceeds

adequate to make all public financing payment obligations associated with Area 12." With

respect to Area 34, the OS stated that the Developer's proposed sale to Colony would generate

sufficient revenue, after deduction of costs, to pay the 1999 Chimney Rock Certificates and the

2000 Desert Tortoise Bonds and fund some of the additional public capital improvements needed

for the residential development of the property pledged as security.

120.    The OS also described a contract with Hertel Development Corporation

("Hertel") "to purchase Areas 7 and 8 on similar terms which the Developer anticipates will be

1  [sic] allow funding of the on-site in-tract improvements and generate proceeds adequate to make

2  all public financing payment obligations associated with Areas 7 and 8."

3       121.   Portions of agreements with Colony and Hertel were appended to the OS

4  in a section entitled "Merchant Builder Materials."

5       122.   The statements in the 2000 Desert Tortoise Bonds OS regarding Colony

6  and Hertel were false and misleading when made. Colony was a real estate broker, not a

7  merchant builder; Colony did not pay deposits required under its agreements; Colony did not

8  have the financial resources to pay the purchase prices specified in its agreements; and Colony

9  and Hertel's agreements were in the nature of option contracts and were not binding

10  commitments to purchase the land specified in the agreements.

11       123.   The descriptions of the Colony and Hertel as merchant builders and the

12  description of their agreements in the 2000 Desert Tortoise Bonds OS were material because they

13  provided assurance that Pacific Golf was on the verge of selling lots at prices that would enable

14  it to fully repay investors.

15       124.   Sarbaz and Pacific Golf knew, or recklessly disregarded, that the

16  statements in the OS concerning the Colony and Hertel agreements were false and misleading.

17       125.   **Hill's Valuation Of The Underlying Property.**  The Desert Tortoise OS

18  made false and misleading representations regarding the value of the Rancho Lucerne land

19  pledged as security for repayment of bonds. The OS quoted from Hill's October 22, 1996

20  appraisal report and Hill's November 12, 1996 letter in which Hill opined that the "fee simple

21  undiscounted value of the subject unimproved land with current entitlements" was $28,000 per

22  acre. Based on that valuation, the OS presented a calculation that the 93 acres pledged as

23  security for the Desert Tortoise Bonds was worth $2,604,000. The OS further summarized Hill's

24  November 16, 1999, letter in which Hill opined that the "As Is" market value of the property

25  pledged as security was $11,139,000. The transmittal letter for the October 22, 1996 appraisal

26  report and copies of the November 12, 1996 and November 19, 1999 letters were appended to

27  the OS. In the October 22, 1996 transmittal letter and the November 19, 1999 letter, Hill stated

28

COMPLAINT                                                    28
S.E.C. v. Sarbaz

1  that those opinions had been prepared in conformance with professional appraisal standards of

2  the Appraisal Foundation and the Appraisal Institute.

3        126.    Hill knew that the appraisal report and November 12, 1996 letter were

4  going to be used to seek financing through securities offerings.  Hill knew that the November 16,

5  1999 letter appraisal would be used to obtain funds from the sale of the Desert Tortoise Bonds,

6  and Hill consented to that use.

7        127.    The statements in the 2000 Desert Tortoise Bonds OS concerning

8  appraised value, Hill's October 22, 1996 appraisal report and Hill's two letter opinions were

9  false, misleading and lacked a reasonable basis on December 29, 2000 when used in the OS.  Hill

10  did not prepare the appraisal report and letters on an "as is" basis, but rather he assumed that

11  Pacific Golf had received all entitlements to develop the property.  Pacific Golf never obtained

12  such entitlements.  Furthermore, Hill's appraisal report and letters failed to comply with the

13  professional appraisal standards he cited because Hill failed to state extraordinary assumptions,

14  failed to perform a proper feasibility analysis to determine the highest and best possible use of

15  the property, failed to analyze available cost data, and failed to analyze available expense data.

16        128.    Sarbaz, Pacific Golf and Hill knew, or recklessly disregarded, that the

17  appraisal report and letters summarized in and appended to the Desert Tortoise OS were

18  materially false and misleading.  They knew that a representative of the Lucerne Valley School

19  District had challenged Hill's appraisals in 1996, contending that Rancho Lucerne was worth no

20  more than $5,000 per acre.  Sarbaz and Pacific Golf also knew that the real estate consulting firm

21  had opined that Rancho Lucerne was worth much less, possibly no more than $3,000 per acre.

22  Prior to the Desert Tortoise offering, Sarbaz, Pacific Golf and Hill received information contrary

23  to the price, cost and absorption data that Hill used as a basis for his November 16, 1999 opinion

24  of value.  Moreover, by December 29, 2000, Sarbaz had a copy of an appraisal, prepared by an

25  independent appraiser retained by the Commission, indicating that Rancho Lucerne was worth no

26  more than $5,000 per acre.

27

28

## FIRST CAUSE OF ACTION

*Fraud in Connection with the Purchase or Sale of Securities*

(Section 10(b) of the Exchange Act

and Rule 10b-5 against all Defendants)

129.   The Commission realleges and incorporates by reference the allegations contained in paragraphs 1 through 128.

130.   Sarbaz, Pacific Golf, and Hill, directly or indirectly, by the use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national exchange, in connection with the purchase or sale of municipal securities, with scienter: (a) employed devices, schemes, or artifices to defraud, (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) engaged in transactions, act, practices or courses of conduct which operated as a fraud or deceit upon other persons.

131.   By reason of the foregoing conduct, defendants Sarbaz, Pacific Golf and Hill violated, and unless permanently enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j (b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder.

## SECOND CAUSE OF ACTION

*Fraud in the Offer or Sale of Securities*

(Section 17(a) of the Securities Act against all Defendants)

132.   The Commission re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 128.

133.   Defendants, by engaging in the conduct described in paragraphs 1 through 128, directly or indirectly, in the offer or sale of municipal securities, by the use of means or instrumentalities of transportation or communications in interstate commerce or of the mails: (1) with scienter, employed devices, schemes or artifices to defraud; (2) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they

1  were made, not misleading; and (3) engaged in transactions, practices or courses of business

2  which operated or would operate as a fraud or deceit upon the purchasers of such securities.

3       134. By reason of the foregoing transactions, acts, practices and courses of

4  conduct, Sarbaz, Pacific Golf, and Hill violated, and unless permanently enjoined will continue

5  to violate, Section 17(a) of the Securities Act [15 U.S.C. §77q(a)].

6  **THIRD CLAIM FOR RELIEF**

7  *Aiding and Abetting Fraud in connection with*

8  *the Purchase or Sale of Securities*

9  (Section 20(e) of the Exchange Act Against Hill Only)

10       135. The Commission re-alleges and incorporates by reference the allegations

11  in paragraphs 1 through 128.

12       136. Sarbaz and Pacific Golf, directly or indirectly, in connection with the

13  purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or

14  of the mails, with scienter:

15      a. employed devices, schemes, or artifices to defraud;

16      b. made untrue statements of material facts or omitted to state material facts

17         necessary in order to make the statements made, in the light of the circumstances

18         under which they were made, not misleading; and

19      c. engaged in acts, practices, or courses of business which operated or would operate

20         as a fraud or deceit upon other persons, including purchasers and sellers of

21         securities.

22       137. Hill knowingly provided substantial assistance to Sarbaz's and Pacific

23  Golf's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17

24  C.F.R. § 240.10b-5], and therefore, pursuant to Section 20(e) of the Exchange Act, violated those

25  provisions.

26       138. Unless enjoined, Hill will continue to violate and to aid and abet

27  violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R.

28  § 240.10b-5].

# PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

A.    Permanently enjoin Sarbaz, Pacific Golf, and Hill, from violating 15 U.S.C. §§ 77q(a), 78j(b) and 78t and 17 C.F.R. § 240.10b-5.

B.    Order Sarbaz, Pacific Golf, and Hill, jointly and severally, to disgorge their ill-gotten gains in an amount according to proof, plus prejudgment interest thereon.

C.    Impose civil money penalties pursuant to 15 U.S.C. §§ 77t(d)(1) and 78u-1.

D.    Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

E.    Grant such other and further relief as this Court may deem just, equitable, and necessary.

Dated: February 21, 2003

Respectfully submitted,

Helane L. Morrison
James A. Howell
Christopher C. Cooke
Patrick T. Murphy

Attorneys for Plaintiff
Securities and Exchange Commission